## THE STATE v. DUBORD.

Sec. 3 of the stat. of 6 March, 1819, punishes three distinct offences, the stealing—the inveigling—and the carrying away, of a slave, each of which subjects the offender to the same punishment; and where, on an indictment under this statute, the accused is charged with the three offences, and a general verdict of guilty is found against him, and no objection is made to the sufficiency of the indictment as to two of the offences, the verdict will not be disturbed.

The provision of sec. 3 of the stat. of 6 March, 1819, as to the stealing of a slave, creates a new offence, different from larceny; and it is not necessary, in indictments under it, to aver the value of the slave, or to use the technical terms descriptive of larceny. The indictment must be governed by the rules applicable to offences created by statute.

A verdict will not be disturbed on the ground of a variance between the names of the jurors who were sworn and tried the case, and those on the list furnished to the accused before the trial. An objection to a juror that his name was not on the list of jurors delivered to the accused before the trial, should have been made when he was presented to be sworn.

APPEAL from the First District Court of New Orleans, McHenry, J.

Elmore, Attorney General, for the State. The defendant claims from this court a reversal of the judgment and proceedings below, upon the following assignment of errors: 1st. That the indictment does not set forth the value of the slave alleged to have been stolen. 2d. That J. N. Otto, S. Golding, L. N. Jahan and J. L. Krabbe, were sworn and tried the case, whereas it appears from the sheriff's list of jurors, that J. M. Otto, J. Golding, L. N. Johan, J. F. Krabbe, were the jurors summoned and drawn to serve during that term.

The first objection is based on the assumption that the offence for which the defendant was tried is a larceny. It is evident from the whole context of the statute of 1819, that the offence at which it is levelled is not the stealing of slaves merely, but all other means or devices by which "the owner is deprived of the use and benefit of his slave." The gist of the offence is "the depriving the owner of the use and benefit of his slave." This may be done by stealing the slave, or by inveigling him away without the *animus furandi*. And yet the offender would undoubtedly be amenable to the penalties of this statute; because the offence consists in "depriving the owner of the use and benefit of his slave," and not in the manner or mode by which he is so deprived of that use and benefit. The offence charged is not a larceny, and cannot be governed

---

* EUSTIS, C. J., absent.

by the same rules. In the case of the *State* v. *H. Miles*, 2 *Nott & McCord* 2, *Gantt*, J., dissenting from the majority on another point in the case, says *arguendo* "that the law of larceny has nothing to do with the case." The judge who delivered the opinion of the majority in that case says: "The act declares that any person who shall be convicted of stealing a slave shall be adjudged guilty of felony and suffer death without benefit of clergy; and as the penalty is annexed to the specific offence, the value of the property is immaterial. Perhaps it is questionable whether it is necessary to lay the property of any value, and, as has been remarked by one of my brethren, the legislature may make the stealing of a pin a capital felony." The statute of South Carolina, as recited in the opinion of the judges, is in the very words of our own, with the exception of the penalty. This interpretation of the act of 1819, is strengthened by the practice of all the prosecuting officers of the State since the passage of the act.

As to the second ground: No objection is made to the personal qualifications of the jurors who tried the cause. It is not pretended that they are not the jurors summoned by the sheriff to serve during the term: let it be remembered also that when they were presented to the prisoner, and he was asked whether he desired to be tried by them, he accepted them. They are, then, as the record shows, jurors of his own choice. His application to this court is therefore based upon the mere naked variance between the clerk's list of jurors drawn and selected, and the entry in the minutes of the jurors who actually served in the case. It is idle to say that they are not the same persons: the slight discrepancy in their names will not raise the presumption against the fact that they were summoned by the sheriff at the place indicated as their residence in the voters' list from which their names are taken. In the earlier stages of the common law almost any defect in the record, or any discrepancy between the different parts of it, was sufficient to sustain a writ of error. The reason given in the books for this great nicety is a singular one. "It, the writ of error, was never granted, except when the king, from justice, when there was really error, or from favor when there was no error, was willing the judgment should be reversed. After writ of error granted, the attorney general never made any opposition; because, either he had certified that there was error, and then he could not argue agaist his own certificate; or the crown meant to show favor, and then he had orders not to oppose. The King, who alone was concerned as prosecutor, and who had the absolute power of pardon, having thus expressed his willingness that the judgment should be reversed, the Court of King's Bench reversed it upon very slight and trivial objections, which could not have prevailed if any opposition had been made, or if the precedent had been of any consequence. The form of the reversal "for errors assigned and other errors appearing upon the record", delivered them from the necessity of specifying any." 1 Chitty, 747, 748. But when in the reign of Queen Ann, it was decided that a writ of error was due *ex debito justitiæ*, this nice and technical jurisprudence naturally changed, and a substantial error would alone give rise to a reversal of the judgment. 1 Chitty, 752. Courts of justice have gradually abandoned these niceties to look to the real interests of justice. As a proof of this, it may be seen by an examination of the cases, that these defects are taken advantage of by motion for a new trial. Some equitable and subtantial ground is sought for, behind the error, for a new trial, and little or no reliance is placed upon the assignment of the error. In the *State* v. *O'Driscall*, (2 Bay, 153) the defect was apparent on the face of the record; the prisoner moved for a new trial, which was refused, and yet he does not take out a writ of error. In the *King* v. *Hunt*, 6 E. R. 475, a case in which a special jury had been struck, two of the special jurymen were not summoned: this omission appeared on the record. A new trial was prayed for and refused, and yet the prisoner does not take out a writ of error. The same observation may be made of the case of *Hill* v. *Yates*, (12 East. 229,) and of the case of the juryman in the note; for although the record was right in both these cases, yet after the facts had been shown upon the motion for a new trial, the error became apparent and might have been assigned. But whenever defects of this character have been brought to the notice of courts of justice upon a writ of error, they have always refused to reverse the judgment. In *Bellows* v. *Williams*, Kirby, 166, one of the jurors who tried the case in the court below sat upon the trial of the same case in the Superior Court. The court refused to arrest the judgment, on the ground that the party had once

STATE
v.
DUBORD.

accepted the juror, and that it was too late to object to him after verdict.   In *Howard* v. *Gifford*, 1 Pick. 43, two talesmen sat upon the trial of a cause for which they were neither summoned nor sworn.   Upon writ of error *coram nobis*, it was held that the objection came too late after verdict.   See 1 Pick, 42, n. 2.; and *Amherst* v. *Hadly*, Ib.   *Hill* v. *Yates* is mentioned and relied upon by the court; that case is law in all the States of the Union; it is relied upon in Kennedy's case, 1 Rob. 590.   In the case of *Horsey* v. *State*, precisely the same ground taken by the prisoner in this case was assigned as error. The objection is taken in these words: " There is a variance between the venire for the petit jury, in the names of the jury, and the names of the jury empannelled to try the cause, and who have found the verdict."  *Horsey* v. *State*, 3 Har. is and Johnson's R. 2.   The court refused to arrest the judgment, and sentence of death was passed.   This case is strictly in point—it was decided upon writ of error.

The true rule is this: that if the party does not take the objection when the juror is sworn, it shall not avail him after verdict.   In the *State* v. *Fisher*, 2 Nott & McCord, 264, the judge states the rule, and adds:  " I cannot forbear saying that if this were not law, I am satisfied, from my own experience, that justice would be laid prostrate at the feet of offenders."   The juror might have been objected to when he was called to be sworn.   In the *State* v. *Powell*, 2 Halst, 246, a juror whose name was accidentally omitted in the panel delivered to the prisoner, was objected to and passed.   The prisoner in this case might have made the same objection to these jurors.   Besides, the jury was empannelled on the 19th January, and continued from day to day until the 23d— the most ordinary diligence would have enabled him to discover the error. The court will not relieve from an error which might have been cured if he had chosen to avail himself of it at the proper time.   The case of the *United States* v. *Wilson*, 1 Bald. 78, and the case of *Dovey* v. *Hobson*, show plainly that if the parties had accepted the jurors the error would have been cured. The reporter in both cases takes care to state that the parties neither consented nor objected.   The case of *King* v. *Tremaine*, 16 E. C. L. R. 318, turned upon the fact that the juror was incompetent to serve, having neither the required age nor the property qualification, which is not pretended in the present case.   The case of *Hasset* v. *Payne*, Cro. Eliz. 256, and the case cited from Barnes. were both cases of attaint, and overruled by *Hill* v. *Yates*.

*R. Hunt*, for the appellant, I.  The indictment is defective, because it does not set forth the value of the slave charged to have been stolen; and does not contain the necessary and technical terms of art.

Starkie says: " As it is essential to every species of larceny that the property be of some value, (x) it seems to be equally necessary that the value should appear to the court upon record.   It is questioned by Serg't. Hawkins, whether the value of the goods be essential to an indictment for trespass or any other crime where the value is immaterial to the nature of the offence, since in many ancient writs of trespass the value of the goods is not expressed.   There seems however to be this material distinction between writs in civil proceedings and indictments; in the former case, the damages are to be assessed by a jury, and therefore it is not so requisite to set out the precise value upon the face of the record; but in criminal cases, the punishment is frequently inflicted at the discretion of the court, which ought therefore to be judicially informed of the circumstances and magnitude of the offence."  Note (x).   See *Mrs: Phipoe's Case*, Leach 774, and Com. Dig. Ind. c. 2.   This seems to be necessary even in those cases where a statute makes it capital to steal a specific chattel, as a cow, &c."  Stark, Cr. Pl. 221.

The distinction between grand and petty larceny, in England, was abolished by 7 and 8 G. 4, c. 29, s. 2; yet Archbold says, "the value of the chattels, in cases of larceny, must be stated."  Arch. C. P. 49, 176.   So, the value must be stated, where a statute makes it penal to steal chattels real, or things that belong to the realty.   Thus the 7 and 8 G. 4, c. 29, s. 44, enacts, that if any person shall steal any lead, &c., or other metal fixed in or to any building whatever, he shall, on conviction thereof, be punished in the same manner as in the case of simple larceny.   Arch. C. Pl. appendix 37.   The indictments on this statute, after the usual commencement, run thus:  " Sixty pounds weight of lead (or iron, brass, or other metal,) of the value of six shillings, the property of J. N., then and there being fixed to the dwelling house, &c., then and there

feloniously did steal, take and carry away, &c." Arch. Cr. Pl. 201. The indictments also for stealing metal fixed in land, &c., on the same statute, in like manner, set forth the value of the metal stolen. Arch. Cr. Pl. 201, 202. All the precedents in the books agree on this point. It is true that, in the precedents of indictments for stealing records, wills, or writings relating to real estate, the value is not alleged. Arch. 194, 195, 196. But the statute expressly declares, " it shall not, in any indictment for such offence, be necessary to allege that the article, in respect of which the offence is committed, is the property of any person, or that the same is of any value." *Exceptio probat regulam.* This statutory exception acknowledges the general rule.

In the common law States of the Union, where slaves are held to be personal property, they are, of course, subjects of theft. Our Civil Code, art. 461, says : " Slaves, though moveables by their nature, are considered as immovables by the operation of law" ; and the statute of 1819, upon which this indictment is framed, enacts, that every person, " who shall inveigle, steal, or carry away any negro, or other slave or slaves, or shall, &c., shall, on conviction thereof, suffer imprisonment at hard labor, not less than two years, nor more than twenty years." Now, the indictment charges that *Dubord* did inveigle, steal, and carry away a certain slave, named *Henry*, the property of one *J. Desmaries.* This is clearly a charge of stealing—of larceny. The value of the slave should therefore have been set forth.

But the attorney general says : " The offence charged upon the defendant is not a larceny, and cannot be governed by the same rules." Surely the charge that the defendant did steal, is a charge of larceny. He proceeds : "It is evident from the whole context of this statute, that the offence at which it is levelled is not the stealing of slaves merely, but all other means or devices, by which ' the owner is deprived of the use and benefit of his slave.' The gist of the offence is ' the depriving the owner of the use and benefit of his slave.' This may be done by stealing the slave, or by inveigling him without the *animus furandi.* And yet the offender would undoubtedly be amenable to the penalties of this statute ; because the offence consists in ' depriving the owner of the use and benefit of his slave,' and not in the manner or mode by which he is so deprived of that use and benefit."

We are told first, that " the offence at which the statute is levelled is, all the means and devices by which the owner is deprived of the use and benefit of his slave." And immediately after that, " the offence consists in depriving the owner of the use and benefit of his slave, and not in the manner or mode by which he is so deprived of that use and benefit !" Neither of these contradictory propositions can be maintained. Suppose a slave should be severely beaten, or maimed, or killed by a person who does not own him. The owner would be deprived of the benefit and use of his slave ; and yet the wrong doer would not be punishable under this statute. The statute provides against three classes of offenders, viz : 1st. Those who inveigle, steal, and carry away slaves. 2d. Those who hire, aid, or counsel persons to inveigle, steal, and carry away slaves, so as to deprive the owner of their use and benefit. 3d. Those who aid a slave in running away. The notion that,to constitute a larceny, there must be an intention on the part of the thief to appropriate the thing stolen to his own use ; in other words, that the act must be done *lucri causâ*, is not well founded. " Larceny is the felonious taking and carrying away the personal goods of another." Black. Com. Dalton says: " Larceny is a fraudulent and felonious taking away another man's personal goods (removed from his body or person), in the absence of the owner, and without his knowledge." Pulton : " Larceny is a fraudulent taking away another man's goods. without the knowledge of him whose the goods be." Lambard : " Larceny is the felonious and fraudulent taking of another man's personal goods, without his will, to the intent to steal them."

In *Rex* v. *Cabbage*, R. & R. 293 (decided in 1815,) the prisoner to screen his accomplice who was indicted for horse stealing, broke into the prosecutor's stable, and took away the horse, which he backed into a coal pit and killed. It was objected by the prisoner's counsel, that this was not larceny, because the horse was not taken with an intention on the taker's part to appropriate it to his own use, *animo furandi et lucri causâ.* In Easter Term, the judges met and considered the case. The majority of the judges held the conviction right. Richards, B., Bayley, J., Chambre, J., Thomson, C. B., Gibbs, C. J., and Lord

Ellenborough, held it not essential to constitute a larceny, that the taking should be *lucri causâ*; they thought "a taking fraudulently, with intent wholly to deprive the owner of the property sufficient." Some of the judges thought that the object of serving the accomplice by the destruction of the horse might be deemed *lucri causâ*, though not in a pecuniary way. So in *Rex* v. *Morfit*, R. & R. 307, where the prisoner took his master's corn to give to his master's horse. Eight of the judges held that this was felony; that "the purpose to which the prisoner intended to apply the corn did not vary the case." Graham, B., Wood, B. and Dallas, thought this not a felony.

In the 1st Report of the Commissioners on Criminal Law, printed by order of the House of Commons, 30th July, 1834, the rules on this point are laid down as follows :

"1st. The taking and carrying away are felonies, where the goods are taken against the will of the owner, either in his absence, or in a clandestine manner, or where possession is obtained by force or surprise, or by any trick, device, or fraudulent expedient, the owner not voluntarily parting with his entire interest in the goods ; and where the taker intends, in any such case, fraudulently to deprive the owner of his entire interest in the property against his will." Rep. p. 16. "The ulterior motive by which the taker is influenced in despoiling the owner of his property altogether, whether it be to benefit himself or another, or to injure any one by the taking, is immaterial." Rep. p. 17.

The attorney general says : "The gist of the offence (in the statute of 1819, and in the case of *Dubord*) is the depriving the owner of the use and benefit of his slave," which, he adds, "may be done—(and the indictment in this case, charges that it has been done)—by stealing the slave."

Now it would be difficult to describe a theft more accurately than the attorney general has described it in these words, and yet he says, this is not a larceny. He adds : "In the case of *The State* v. *Miles*, 2 Nott & McCord, 2, Gantt, J., dissenting from the majority on another point in the case, says *arguendo*, "that the law of larceny has nothing to do with this case." Unfortunately the majority of the court differ with Judge Gantt on this point, as well as on the other points of *Miles'* case. In that case a motion was made for a new trial, and in arrest of judgment, upon the grounds : I. That the act (from which our statue was borrowed,) contemplated two distinct offences: *first*, stealing from the owner; and *secondly*, stealing from the employer : and that the indictment was not supported by the evidence, as the negro was in the possession of the employer, and not of the owner. II. That the offence, if commited at all, was committed in Willlamsburgh and not in Charleston District. III. That the jury were authorised to find the prisoner guilty of petit larceny, under the indictment, and the judge ought to have instructed them to that effect. The court decided : 1st, "That it was the intention of the legislature to make the stealing of a negro, whether from the master or employer, a capital felony ; and that in the case before them, the master had not parted with the possession of the negro :" 2d, It is admitted, said the court, "that the evidence of the prisoner's guilt was sufficient to authorise a conviction, if he had been indicted for a larceny at common law ; and that the selling of the negro in Charleston, was sufficient to subject him to a trial there for such larceny. But it is contended that the offence created by this act, is in the manner of a compound larceny, and that the act of stealing and carrying away must be accompanied with inveigling, to consummate the felony ; and as the inveigling, if any, was in Williamsburg, the defendant must be tried there, and not in Charleston." The court held that the stealing and carrying away were of themselves a felony, and that it was not neccessary that the inveigling should accompany them under the act : that the act embraced all who should steal and carry away, with or without inveigling : That personal property is always considered constructively in the possession of the owner, and whenever one man disposes of another's property without his will, and when he has a right to his service, the law implies a loss of service :" 3d. The court said : the presiding judge informed the jury, that "though he advised them not to find a verdict of petit larceny, they might find a special verdict, declaring the property of less value than twelve pence. But the jury found a general verdict, which puts an end to this point." The court took occasion to add, that even if the jury had found the special verdict, the punishment would have been the same, as the penalty was annexed to the specific offence. Here the case, with all the points in-

volved, ended. But the judge, who delivered the opinion of the court, remarked: "Perhaps it is questionable whether it is necessary to lay the property of any value." This is a mere *obiter dictum.* The point was not before the court; the indictment in the case appears to have set forth the value of the slave; and no court in the Union has more frequently and carefully declared, that "the opinions of the court are only to be considered as authority, on the points actually decided." This *obiter dictum* is entitled to no weight, against the authorities cited in this argument.

But we are told that the offence is a new one, and is charged in the words of the statute; and that this is sufficient in an indictment under the statute. Starkie, in his Criminal Pleadings, p. 235, ch. 12, expressly denies this, and lays down the contrary rule, and so does Chitty in 1 C. C. L. p, 2/6 (marg.) So does Hawk., b. 2, c. 25, s. 111. In the case of *The State* v. *Raines*, 3 McCord's R. 543, the court said : " Suppose this to be a new offence. It is as necessary in the case of a new offence, as in the case of an old one, that a man should know what he is charged with, and how he is to defend himself. It is evident that the law has been mistaken by the solicitor, in his supposing that it was enough to say an offence has been committed in the words of the act." The court then stated "the reasons for which the law exacts a certain particular description of an offence." They are : " 1st, to identify the charge ; 2d, to enable the defendant to plead, *autrefois acquit*, or *convict* ; 3d, to warrant the court in granting or refusing any particular right, claimed as incident to the case; 4th, to enable the defendant to prepare for his defence, to plead, or to demur, &c.; 5th, finally and chiefly, to enable the court, looking at the record after conviction, to decide whether the facts charged are sufficient to support a conviction of the particular crime, and to warrant their judgment; and, also, in some instances, to guide them in the infliction of a proportionate measure of punishment upon the offender. Now this certainty consists of two parts. The matter to be charged, and the manner of charging it. Hence has originated the error as to the law. The matter is the crime, and this, in a new offence by statute, must be in the language of the statute, and with all that is necessary to constitute the crime. Hawk. 73, 77. Chit. 1. But the manner is as necessary in the one case, as in the other ; and Starkie, in p. 236, of his treatise on Criminal Proceedings, says: 'It may therefore be assumed, that there is no difference between common law and statutable offences, as far as regards the general rules, according to which the expanded description of the offence should be expressed on the record ; except, indeed, in those instances (and the exception confirms the observation,) where the legislature has peremptorily directed that some general form of words shall be used.' And this is confirmed by Chitty, vol. 1, p. 275, and by Hawk. 2, ch. 25, ss. 99, 111. Although they admit that it has been held otherwise by Lord Holt, whose authority, however, on the subject cannot be put in the scale against the satisfactory reasoning of the author referred to, and the repeated decisions made since his day."

From these views, it is manifest that it was necessary to set forth in the indictment against *Dubord*, the value of the slave charged to have been stolen by him. It is submitted that it was also necessary in charging him with stealing a negro, to make use of the technical and appropriate words descriptive of the offence of stealing. The law knows best how to express itself in its own terms. " By successive decisions the legal value and weight of a term or phrase of art is ascertained ; and should a doubt arise as to its meaning, reference for the purpose of removing it, may be had to former authorities, whilst every new expression would introduce fresh uncertainty, and the benefit to be derived from precedent would be wholly lost." St. 81. Blackstone says : " In some crimes particular words of art must be used, which are so appropriated by the law to express the precise idea which it entertains of the offence, that no other words, however synonomous they may seem, are capable of doing it. Thus in larcenies, the words *felonice cepit et asportavit* are necessary to every indictment; for these only can express the very offence." 4 Bl. Com. 307. Chitty says: "So in an indictment for larceny, the words 'feloniously took and carried away,' are necessary." 1 C. C. L. 244. Starkie says: " In case of larceny, the words ' feloniously took and carried away' the goods, or 'took and led away,' the cattle, are essential." Archbold says : " They are technical words, essential to the definition of the offence, and if omitted the defendant may move in arrest of judgment." Arch. C. Pl. 50. In the indictment before the court,

STATE
v.
DUBORD.

the technical term, or word of art, "took,' ' cepit,' is omitted. The indictment is therefore defective.

II. Should these objections to the indictment be overruled, the defendant prays for a new trial and an arrest of judgment, upon this ground : It appears by the record, that J. N. Otto, S. Golding, L. N. Jahan, J. Robb, and J. L. Krabbe, who were sworn and acted as jurors in the trial of this case, are not the same persons who were drawn, summoned, and returned to serve as jurors.

The act of March 13, 1833, B. & C. Dig. 526, declares " that it shall be lawful for the sheriff of the parish of Orleans, or his deputy, together with the clerk of the Criminal Court of the First District, or his deputy, to draw during the last week in the month, or as soon thereafter as convenient, under the direction of the court, (in the french text, ' d'après l'ordre de la cour,') the number of jurors, &c., as provided in the act of 25th March, 1831." The act of 25th March, 1831, B. & C. 524, states that to qualify a man to serve as a juror, he must " have resided at least twelve months before a new venire is formed in the parish or district in which the jury is summoned."—Section 1. The 3d section provides, " that if, at any time, the number of jurors drawn to serve in any court of the first district of this State, should become insufficient for the good and speedy administration of justice, the judge of such court is authorised to direct that such an additional number of jurors as he shall consider requisite, shall be drawn according to law, on such a day as he shall appoint; and if it should happen that the said drawing be not then made, the judge shall fix another day for that purpose."

It appears from the record that, in conformity with these laws, the judge of the court below, ordered a venire to be issued on the      day of December, 1846, for summoning forty-eight jurors to serve during the month of January, 1847; and a second venire to be issued on the   ·  day of January, 1847, directing an additional number of jurors to be summoned for January, 1847. It makes no difference whether these orders are particular precepts to the sheriff, or writs of venire facias ; or whether they are more general precepts in the nature of writs of venire facias. They are certainly orders directed by the judge to the sheriff and the clerk of the court, commanding them, &c., and ought to be under seal ; and for want of the seal of the court, the process is erroneous, and all the proceedings under it are void. See The People v. McKay, 18 Johns. Rep.

III. But suppose that the law of Louisiana is otherwise, and that the process need not be under seal. The 35th sec. of the act of 1805, provides that the accused, in cases similar to the present, shall have a copy of the list of the jury, who are to pass on his trial, delivered to him, at least two entire days before he shall be tried. B. & C. 248. The sheriff and clerk who draw and summon the jurors, being officers of dignity and consequence, and acting under the obligation of an oath, and the jurors being summoned beforehand, and the list being delivered to the accused, who has thereby notice of the jurors, their characters, connexions and relations ; their associations, passions and prejudice, so that he may discreetly exercise the right of challenge; it was thought that the accused would be secured in the right of trial by an impartial jury. In the present case, a correct copy of the lists of the jurors drawn and summoned to pass on Dubord's trial, was delivered to him more than two days before he was tried. The record also shows that J. N. Otto, S. Golding, L. N. Jahan, J. Robb, and J. L. Krabbe, were sworn and acted as jurors in the case, and that they are not the same persons who were drawn and summoned to serve in the case. The attorney general has not attempted to explain this variance, which is patent on the record. He has not attempted to prove that the jurors sworn were the same persons who were summoned and returned on the venire. The list of jurors who were sworn and who tried the case, and the list of jurors drawn and summoned, and returned, a copy of which list was served on the accused, show variances in the christian names, the middle names, and the surnames ; and all the books agree that these are material variances. J. R. McQuilland, instead of R. J. McQuilland, was held a material variance. 5 D. & E. 195. McCann and McCarn, Shakepear and Shakespeare, Tabart and Tarbart, Shutliff and Shirtliff, which the attorney general would daintily term " slight discrepancies," have been held to be fatal variances. R. & R. 351. 2 East. 83. 5 Taunt. 814. 1 C. C. L. 216.

The attorney general says : " No objection is made to the personal qualifica-

tions of the jurors who tried the cause," and he calls the defendant's objection a mere technical objection, not founded in reason. The true principle in this case, is to consider whether the party accused has had the security of a lawful jury to try him ? All questions touching the formation of juries must be examined by the judges with the most scrutinising eye. The complaint in the present case is, that after the judge had issued his order according to the acts of 1831 and 1833 ; after the clerk and sheriff had drawn from the jury-box the names of the jurors ; after these jurors had been summoned, and a copy of the list of them had been delivered to the accused, and due returns had been made of these proceedings to the court ; after the list of the jury who were to pass on his trial had been settled and determined according to law, a change was made, and the accused was tried by jurors not on the list—or rather, the list made out according to law was set aside, and a new and illegal list substituted. The defendant was entitled to be tried, and ought to have been tried, out of the list duly drawn and summoned, and served upon him. He was tried out of another list. Five persons sat upon his trial, who were not on the legal list of the jury. If five persons can be thus placed on a jury, how easy would it be to pack the entire jury ? Where would then be the right to a trial by an impartial jury ?

When the name of a juror is drawn from the jury-box according to law, the presumption undoubtedly is that the person whose name is thus drawn has the qualifications of a juror. But there is no such presumption in favor of one whose name is not drawn from the jury-box. The record shows that the names of five persons who sat as jurors in this case, were not drawn from the jury-box. The presumption of law is that they were not qualified to act as jurors. The attorney general did not offer any proof to show that they were good jurors, duly qualified. None of the statutes of jeofail and amendment in England, extend to criminal proceedings. The stats. 14 Ed. 3, c. 6 ; 8 H. 6, c. 12, 15 ; 32 H. 8, c. 30 ; 21 Jac. 1, c. 13 ; 27 Eliz. c. 5 ; 4 Ann. c. 16 ; 5 G. 1, c. 13 ; 4 G. 2, c. 26 ; 18 Eliz. c. 14, do no apply to criminal cases. As to the effect of these variances, see Trials per Pais, p. 60 to p. 63. Coke's Reports, p. 150 and 151. 3 Bac. Abridg. p. 776. 2 Hawk, 416, 418, 421, 422. Norman v. Beamont. Willes, 484. Wray v. Thorn, Willes, 488. King v. Tremaine, 16 Eng. C. L. Rep. 319. In 1 Baldwin, 83, April 1830, before J. Baldwin, of the Supreme Court of the United States, and J. Hopkinson, district judge : "Before the exhaustion of the panel, several jurors were called, who had been returned on the venire by wrong names. John Byrly had been returned by the name of John Byerly ; Matthew Pennypacker, in the name of Nathan Pennypacker ; George H. Pauling in the name of George M. Pauling." By the court : " The jurors cannot be sworn. It would be a mistrial, if it should appear by the record that the juror sworn was not the same person who was summoned and returned on the venire. The district attorney objected ; prisoner's counsel neither objecting nor assenting."

In answer to these authorities, the attorney general refers to The King v. Hunt, 4 B. & Ald. 430, a case in which a special jury had been ordered ; two of the special jurymen were not summoned. The court refused a new trial, declaring there was " no direct authority on the point," and sustained the verdict found by the ten special jurymen and two talesmen. This case in no way affects the point made by Dubord. The attorney general next refers to the case of Hill v. Yates, 12 East. 229, and to the case of the juryman in the note, in which case, he says, the record was right ; but after the facts had been shown upon a motion for a new trial, the error might have been assigned. Hill v. Yates, is a civil case ; besides, the record was there right. In the case of the juryman, 12 East. 231, the man who served on the jury had been duly summoned, though by a wrong name, and he was also proved to be duly qualified to serve. But there is no proof in the present case, that either of the five persons who served as jurors, and who are objected to by Dubord, had any of the qualifications of jurors. Besides, there is not a tittle of evidence to prove that these five persons were ever summoned. Moreover, the record in the case of the juryman was right, and no amendment was necessary. But here the record shows error on its face ; shows a variance in the names of the jurors ; and shows that the persons who tried the cause were not the same persons sworn and summoned. The case of Hill v. Yates, has been reviewed in The King v. Tremaine, already cited by me ; and the reasoning on which it was decided, has been answered by C. J. Abbott.

STATE
v.
DUBORD.

The attorney general refers to *The State* v. *O'Driscoll*, 2 Bay, 153, and to the case of *The State* v. *Kennedy*, decided by our late Court of Errors in criminal cases. 8 Rob. 590. Both these decisions were correct. They simply decide that if an alien is drawn and summoned as a juror, and is returned as such, and his name appears on the jury list furnished to the accused according to law, it is a good ground of challenge *before* trial; but that it is too late after trial and conviction, to make it a ground for a new trial. This is very different from the case, where a person, who has not been drawn and summoned, acts as a juror.

In *King* v. *Tremaine,* already cited, Abbott, C. J., said: "I do not see how a challenge, properly so called, could have been taken to this person, he not having been summoned as a juror. If he had been returned on the panel, then a challenge would have been the proper mode of objecting to him. 7 Dowl. & Ryland, 684, decided in 1826. Bayley, J., said : "He has not been summoned or returned on the panel. I apprehend that one of the objects of taking jurors jurors from the panel is, that notice may be given to the parties before the jurors come to the assizes, so as they may know to whom to direct their challenges." Bayley, J., then refers to cases in which it was held that if one man be returned in the *venire facias*, and a different man in the distringas, who serves as the juror, it is error. Littledale, J., said : "It is admitted on all sides, that if a person is "returned on the panel, who is incompetent to serve on the jury, it is a cause of challenge: but in this case the young man was not returned upon the panel, nor was he summoned. He was, therefore, no juror at all." So in *Norman* v. *Beamont*, Willes R. 487, Lord C. J. Willes, said : "We were of opinion that this could be no cause of challenge. There was no objection to *Richard Geater*, the person returned. But this was an extrinsic objection not appearing on the face of the poll. A challenge to a juryman, supposes him capable of serving on the jury, if the objection be answered. But *Richard Shepherd* was no juryman at all." He was neither summoned nor returned on the panel. It was held, therefore, that this was not matter of challenge, and could be taken advantage of after verdict. The remarks already made, furnish a full answer to the cases of *Amherst* v. *Healey*, 1 Pick. 38, and *Howland* v. *Gifford*, 1 Pick. 43.

The attorney general refers to the case of *Dovey* v. *Hobson*. C. J. Gibbes, treated in that case the decision in *Hill* and *Yates* with much deference ; but he set aside the verdict in favor of *Dovey*, because a person not summoned on the jury had been sworn and acted as juror in the name of the party summoned. The rest of the court concurred. The Chief Justice said :—"Willes, C. J., with his usual precision, states the four ways in which questions of this sort can be brought before the court: By motion in arrest of judgment; by motion for an amendment; by motion for a new trial; or by writ of error in a superior court. * * * He shows clearly that there would be a variance between the *venire* process and the record, on which judgment for the plaintiff might be arrested for the variance, and the question was whether a new trial should be granted. Here no amendment is necessary : as the record now stands, no motion in arrest of judgment can be made, nor can the objection be taken on a writ of error. Here every thing is regular on the record, and can be rectified only on a motion for a new trial. That is discretionary with the court, &c." This decision was rendered in 1816, ten years prior to that of *Rex* v. *Tremaine*, and appears to me, in a good measure, to support the motion in arrest of judgment, now under consideration..

A clear proof of what the law upon this subject was in England, is to be found in the 21st section of st. Geo. 4, c. 24, which was passed to remedy certain evils and imperfections in the criminal law. This remedial statute, enacted : "That no judgment after verdict upon any indictment or information for any felony or misdemeanor, shall be stayed or reversed for want of a *similiter*, nor by reason that the jury process has been awarded to a wrong officer, nor for any misnomer or misdescription of the officer returning such process, or of any of the jurors, *nor because any person has served upon the jury who has not been returned as a juror by the sheriff or other officer.*" Arch. C. Pl. App. XVI. A similar statute was found necessary in New York. "When a verdict shall have been rendered in any case the judgment therein shall not be stayed, &c., or reversed, impaired, or in any way affected by reason of a mistake in the name of any juror or officer." 2 R. S. N. Y. 425, s. 7, 11. And should a question arise upon a defect of this kind, it is further provided that the "defects and variances"

of the like nature, not being against the right and justice of the suit or trial, shall be supplied and amended by the court, &c.  2 R. S. 425, s. 8.  In Massachusetts, it is provided by statute that " no irregularity in any writ of *venire facias* or in the drawing. summoning, returning or empannelling of jurors, shall be sufficient to set aside a verdict, unless the party was injured by the irregularity, or unless the objection was made before the returning of the verdict."  Rev. Stat. Mass.  Similar statutes have been passed by other States of the Union.

The attorney general cites the case of *Horry* v. *State*, 3 Har. and John, 2, where a motion was made to arrest judgment on the ground, that there was a " variance between the *venire* for the petit jury, and the names of the jury empanelled to try the cause, and who found the verdict."  The court refused to arrest the judgment.  Not a word is said as to the grounds of the decision.  No case, no law, no fact is stated.  The motion is stated, and the reporters simply add : " The motion was over-ruled.  Although I find a statute passed in 1795, to remedy such a variance in civil cases, in Maryland, I have not been able to find any legislative provision on the subject in criminal cases.  I leave this case, therefore, to be weighed by this court, against the arguments and authorities which I have brought forward.

The judgment of the court was pronounced by

KING, J.*   The defendant was prosecuted under the 3d section of the act of 1819, (Acts p. 62–3) which is in the following words :  "All and every person or persons who shall inveigle, steal, or carry away any negro, or other slave or slaves, or shall hire, aid, or counsel any person or persons, to inveigle, steal, or carry away as aforesaid any such slave, so as the owners of such slave or slaves shall be deprived of the use, &c., on conviction of any such offence, shall suffer imprisonment at hard labor, &c."   The defendant was convicted, and after ineffectual motions for a new trial, and in arrest of judgment, appealed.

It is contended : 1st.  That the indictment is defective, because it contains no allegation of the value of the slave, and because it does not contain the technical words essential to the description of the offence.  2d.  That the verdict should be set aside, because several of the persons who were sworn and acted as jurors on the trial, were not the same persons drawn and summoned to serve as jurors.

I.  To the first objection it would probably be a sufficient answer to say that, the statute declares several offences, among which are : 1st, stealing; 2d, inveigling; 3d, carrying away a slave.  Each of these is a substantive offence.  All of them have been charged upon the defendant, and a general verdict of guilty has been found by the jury.  No objection has been made to the sufficiency of the indictment, as regards the two offences last enumerated.  Thus, if the ground be well taken that the stealing of a slave under this statute is strictly larceny, and that it is indispensable in indictments for larceny to aver the value of the thing stated, and to use the technical terms essential in the description of that offence, there still remains a conviction for inveigling, and for carrying away, each of which under the statute is an offence equally as grave as the stealing, and visited with the same punishment.

But we think that, even with regard to the stealing of a slave, the statute has declared a new offence, distinct from larceny ; and that it is not necessary, in indictments under it, to aver the value of the slave, nor to use the technical terms descriptive of larceny.  The indictment must be governed by the rules applicable to offences declared by statute.  Foster, Crown Cases, p. 423, says :  " It may, I think, be laid down as a general rule, that indictments

STATE
v.
DUBORD.

STATE
v.
DUBORD.

grounded on penal statutes, especially the most penal, must pursue the statute, so as to bring the party precisely within it; and this rule holds as well with regard to statutes which take away clergy from felonies at common law, as to statutes creating new felonies. " The indictment," saith Stanford, " must set forth the offence in such manner as it is expressed in the statute, otherwise the offender shall have his clergy." And again, p. 424.: " Indictments upon penal statutes must strictly pursue the statute." See also 2 Hale, 170. Hawkins, b. 2, chap. 25, sec. 113. 1 Chitty's C. L., 286, 287. In the present instance the offence could not well have been charged with more precision and certainty, than by using the words of the statute itself.

II. Among the jurors summoned, a list of whom was furnished to the accused, the following names appeared, viz: *J. M. Otto, J. Golding, L. N. Johan, J. W. Robb, J. F. Krabbe.* Among the jurors who were sworn, and tried the cause, were the following, viz: *J. N. Otto, S. Golding, L. N. Jahan, J. Robb, and J. L. Krabbe.* It is contended that these variances in the names are material, and vitiate the verdict. No objection was made to the jurors, when they were offered to the prisoner or the trial. The court is unanimously of opinion that the objection now comes too late, and that if the accused desired to oppose the swearing of the jurors on this ground, he should have made his objection when they were presented. The law has carefully protected his rights in this respect, and furnished him with every facility for making such objections as he may have to urge to jurors. He can complain neither of surprise nor injustice. He had in his possession, for two days previous to the trial, a list of the jurors who were to be presented to him. When *J. N. Otto,* was presented, a reference to the list, furnished expressly for the purpose of enabling him to make his challenges, must have shown him that *J. M. Otto* was the person whom he had the right to insist on having presented. He had the right before exercising his challenge to enquire whether the juror offered was the juror summoned, and if it appeared that he was not, to insist that he be set aside. No objection was made to the persons in question, on this or other grounds, and no right secured by law to the prisoner was denied to him on the trial. Not only was objection to the jurors waived, but the record shows that they were expressly accepted by the prisoner.

In the case of *Hill v. Yates,* 12 East, 230, a similar question was presented. Lord Ellenbourgh then said, if the judges " were to listen to such an objection, they might set aside half the verdicts given at every assizes, when the same thing might happen from accident and inadvertence, and possibly sometimes from design, especially in criminal cases." The case of the *King v. Tremaine,* 16 Com. Law Rep. 319, does not appear to us to overrule the case of *Hill v. Yates.* In the former it was shown that the person sworn as a juror was a minor, and absolutely incompetent to serve. The court said that the verdict was the verdict of eleven jurors, and distinguished the case from that of *Hill v. Yates,* in which the juror appeared to have possessed the necessary qualifications. Sec. 2 Bay's Rep. 155. 2 Nott & McCord, 264. 1 Chitty, Criminal Pleading, 545. 3 Harris & Johnson's Rep. 2.

*Judgment affirmed.**

---

* *R Hunt,* for a re-hearing: It has been intimated by the court, that no writ, no order in writing from the judge, was necessary in directing the jury to be summoned; and that when the law directs the jury to be drawn under the direction of the court, it means in the presence and under the superintendence of the judge, without any order from him. This is at war with the spirit and letter of our statutes. The order ought therefore to have

been under seal; and for want of the seal of the court, the process was erroneous; and the proceedings under it are void. See the case of *The People* v. *McKay*, 18 Johns. Rep. 212, and *The State* v. *Dozier*, 2 Spear's Rep. 216. In the latter case the court say, per O'Neall, J: "In this case, it is only necessary to consider the prisoner's third ground, in arrest of judgment, for that will avail him. In 2d Hale's Pleas of the Crown, 160; it is said, "the *venire facias*, as all other process of that court, (the King's Bench,) issues in the King's name, under the seal of the court, and that of the chief justice, and always ought to bear test after the issue joined between the King and the prisoner." The description of process to compel the attendance of jurors; in 2d Hawk, P. C, book 2, chap. 41, sec. 1, is very much like the course of our own practice in relation to the *venire*. He says: "It is agreed that justices of jail delivery may have a pannel so returned by the sheriff, without any precept or writ; and the reason given for it is, that before their coming, they always make a general precept to the sheriff on parchment, under their seals, to bring before them, at the day of their sessions, twenty-four out of every hundred, &c., 'to do those things which shall be enjoined them on the part of the king,' &c. This is a general *venire* for the term, and is so far like ours, and is only different, that it has no panel annexed; and ours, according to jury law, has. It is to be observed, that this general precept is under the seals of the justices, and without that would be bad. The argument is, therefore, irresistible, even from this authority, which is more favorable to the State than any other, that a summons of the jury by virtue of a pretended writ of *venire*, not under seal, cannot be good. What effect the want of a *venire* not under seal, for both the grand and petit jury, upon the trial of a prisoner convicted of a capital felony, would have, the case of *The People* v. *McKay*, 18 J. R. 112, is full to the point, that it is a good ground to arrest the judgment."

In the case of the *State* v *Williams*, since decided in South Carolina, where the accused was convicted of murder, and in four other cases at the same term, judgment was arrested upon the same ground, on the authority of the previous case of *Dozier*.

The practice of our courts is also entitled to consideration. I have enquired of the clerks of the Third, the Fourth, and the Fifth District Courts, and I find that writs of *venire* have always been issued by those courts, and by the former District, Parish, and Commercial Courts of New Orleans, when a jury was summoned to try a cause. The minutes of the First District Court of New Orleans, also show, that under Judges Preston and Canonge—(I have not examined further)—a *venire* was always ordered by the court, for drawing and summoning a jury. The courts have called these orders by the name of *venire*. The statute of 1831, expressly styles the order a *venire*. Judge McHenry, in his orders, uses the word *venire*. They answer exactly to what Judge O'Neal terms "a general *venire* for the term." Style it writ or order, still it must be under seal; and there is no seal to the *venires* in this case. Unless the law is observed in drawing and summoning jurors, the right to a trial by an impartial jury is gone.

2d. In order to secure to the accused a trial by an impartial jury, the law has not only defined the qualifications of jurors; and prescribed the mode of drawing and summoning them under orders of the court; but it has explicitly declared, that he shall be tried by the jurors so drawn, and by none others. The 35th section of the act of 1805, says: "Every person who shall be accused and indicted for any crime punishable with imprisonment at hard labor for life, or for seven years or upwards, shall have a copy of the indictment and list of the jury who are to pass on his trial, delivered unto him, at least two entire days before he shall be tried for the same." Bul. & Cur. 248.

When the legislature says, the accused shall have a list of the jurors who are to pass on his trial delivered to him, it means that the jurors who are to pass upon his trial shall be upon the list delivered to him; it means that he shall be tried by the jurors upon the list, and no other jurors. It means that, or it means nothing. The record shows, that a list of jurors drawn and summoned, and who, by law, were to pass upon Dubord's trial, was delivered to him; and that five persons who were not drawn and summoned, and whose names were not on the list of the jurors delivered to Dubord in conformity with law, did, notwithstanding, act as jurors in the case, and did pass upon his trial, in direct and palpable violation of law. The court says, that "this objection comes too late." I contend that the objection is never too late, when it appears patent on the record that the law has been violated. This is the doctrine to be collected from the cases cited in argument at p. 739.

It is said the appellant ought to have challenged the jurors who were not on the list, and that the objection comes too late, and the cases from 2 Bay, 155, and 2 Nott & McCord, 264, are relied on in support of this. The answer is at hand: Whenever a person is drawn and summoned as a juror, and his name is on the list served on the defendant, it is his duty, if he wish to object to him, to exercise the right to challenge, at the time the juror is offered; because the juror having been drawn and summoned, if the challenge is overruled, the party would be a good juror on the record. But where a person has not been drawn and summoned, and his name is not on the list of jurors, who are to pass on his trial, he cannot be a juror without a violation of law. See the cases of *Norman* v. *Beamont*, and *The King* v. *Tremaine*, cited in argument for the appellant. In the cases from Bay, and from Nott & McCord, the juror objected to was duly summoned and sworn, and therefore might have been challenged, and consequently the objection came too late. But in

STATE
*v.*
DUBORD.

the present case the persons objected to were not drawn, summoned, or returned, and were not on the panel or list delivered to the defendant; they were, therefore, no jurymen at all, and no challenge, properly and technically speaking, could have been taken to them—since, in no event could they be good jurors. The defendant is, therefore, entitled to the benefit of his objection after verdict.                     *Rehearing refused.*